MERIWETHER L. CLARK, EXECUTOR, AND WILLIÁM P. CLARK, GEORGE R. H. CLARK, AND JEFFERSON KENNERLY CLARK, AN INFANT UNDER THE AGE OF TWENTY-ONE YEARS, BY HIS GUARD-IAN AD LITEM AND NEXT FRIEND, THE SAID GEORGE R. H. CLARK, HEIRS AT LAW OF WILLIAM CLARK DECEASED, APPEL-LANTS, vs. ANDREW SMITH, APPELLEE.

The colonial charters, a great portion of the individual grants by the proprietary and royal governments, and a still greater portion by the states of the Union after the Revolution, were made for lands within the Indian hunting grounds. North Carolina and Virginia, to a great extent, paid their officers and soldiers of the revolutionary war by such grants, and extinguished the arrears due the army by similar means. It was one of the great resources which sustained the war, not only by those states, but by other states. The ultimate fee, encumbered with the right of Indian occupancy, was in the crown previous to the Revolution, and in the states of the Union afterwards, and subject to grant. This right of occupancy was protected by the political power, and respected by the Courts, until extinguished, when the patentee took the unencumbered fee. So this Court and the state Courts have uniformly held.

The state of Kentucky has an undoubted power to regulate and protect individual rights to her soil, and to declare what shall form a cloud on titles; and having so declared, the Courts of the United States, by removing such cloud, are only applying an old practice to a new equity created by the legislature, having its origin in the peculiar condition of the country. The unappropriated lands of the state of Kentucky have been opened to entry and grant, at a very cheap rate, which policy has let in abuses. The clouds upon old titles by the issuance of new patents for the same lands were the consequence; and the citizens of other states are entitled to come into the Courts of the United States, to have their rights secured to them by the statute of Kentucky of 1796.

The state of Kentucky may prescribe any policy for the protection of the agriculture of the country, that she may deem wise and proper. She has, in effect, declared that junior patents issued for previously granted lands, shall be delivered up and cancelled; with the addition, that a release of title shall be executed; and it is the duty of the Courts to execute the policy.

Where the legislature declares certain instruments illegal and void, there is inherent in the Courts of equity a jurisdiction to order them to be delivered up, and thereby give effect to the policy of the legislature.

The state legislatures have, certainly, no authority to prescribe the forms or modes of proceeding in the Courts of the United States; but having created a right, and at the same time prescribed the remedy to enforce it, if the remedy prescribed is substantially consistent with the ordinary modes of proceeding on the chancery side of the Federal Courts, no reason exists why it should not be pursued in the same form as in the State Courts. On the contrary, propriety and convenience suggest that the practice should not materially differ when titles to land are the subjects of investigation.

In the state of Tennessee the legislature has provided that the Courts of equity may divest a title, and vest it in another party to a suit; and that the decree shall operate as a legal conveyance. In Kentucky the legislature has declared that Courts may appoint a commissioner to convey, as attorney in fact of litigant parties, and such shall pass the title; in both instances binding infants and femes coverts if necessary. The Federal Courts of the United States, in the instances referred to, have adopted the same practice for many years, without a doubt having been entertained of its propriety. It may be said, with truth, that it is a mode of conveyance, and of passing title, which the states have the exclusive right to regulate.

The undoubted truth is, that when investigating and decreeing on titles in this country, the Court must deal with them in practice as it finds them, and accommodate our modes of proceeding in a considerable degree to the nature of the case, and to the character of the equities involved in the controversy, so as to give effect to state legislation, and state policy; not departing however from what legitimately belongs to the practice of a Court of Chancery.

ON appeal from the Circuit Court of the United States for the district of Kentucky.

William Clark, the father of the appellants, filed a bill in the Circuit Court of the district of Kentucky, praying the Court to compel the defendant to release his pretended title to certain lands in the state of Kentucky, claimed by him under certain patents obtained from the state of Kentucky, more than thirty years after the registration of the survey of the ancestor of the complainants, George Rogers Clark. The possession of the land had continued in the ancestor of the complainant, and in himself, up to the time of the filing of the bill. The conveyance asked by the bill was sought to be in conformity with the provisions of the act of the assembly of Kentucky giving jurisdiction to Courts of Equity in such cases.

The Circuit Court was unanimously of opinion that the complainants had established the legal title to the land mentioned in the bill, under a valid grant from the commonwealth of Kentucky, to George Rogers Clark, his ancestor, and that he was in possession of the same at the commencement of this suit; and that the defendant had not shown that he had any right or title, either in law or equity, to the land or any part of it: but the judges of the Circuit Court being divided in opinion on the question of the jurisdiction of the Circuit Court to compel the defendant to execute the conveyance prayed for in the bill, it was not the opinion of the Court (the defendant having set up and exhibited junior patents from the commonwealth of Kentucky for the land, to himself) that on any other ground apparent in the cause, the Circuit Court had jurisdiction, on the general principles which determine the equity jurisdiction of the Courts of the United States, to grant to the complainants any other relief. The bill of the complainants was dismissed; and they prosecuted this appeal

A printed argument was submitted to the Court by Mr. Crittenden for the appellants. No counsel appeared for the defendant.

The argument of Mr. Crittenden stated :—

This is a suit in chancery, under the 29th section of the act of 1796, (Ken. Stat. Law, 293,) to compel the defendant to release his pretended claim to the land in question. The complainant derives title as follows, to wit: Patent to George Rogers Clark, dated 15th September, 1795, founded on an entry on treasury warrants, made 26th October, 1780, "to begin on the Ohio, at the mouth of the Tennessee river, running down the Ohio," &c. &c., surveyed June 7th, 1784, and registered June 4th, 1785; the survey and patent being for 36,962 acres. The patented George Rogers Clark, afterwards conveyed to William Clark, by deed dated 28th July, 1803, proved and recorded in the Court of Appeals in November, 1803.

At the suit of a creditor of he said patentee, the same tract of land, after the deed to William Clark, was subjected to sale, for satisfaction of the creditor's demand, and was then again purchased by George Woolfolk, to whom the commissioner of the Court

(Samuel Dickinson) conveyed it by deed of the 14th June, 1827; and Woolfolk, by deed of the 13th October, 1827, conveyed to the said William Clark.

William Clark, thus doubly invested with assurance of title, and alleging possession of the land, filed his bill to compel a release of the defendant's pretended claims.

The defendant, by his answer, contests Clark's title on various grounds, and asserts his own claims, which are nothing more than ninepenny claims, originating within a few years past, by entries and purchases made with and of the public receiver, under the laws of Kentucky for the disposal of the lands of the state below the Tennessee river.

The documentary evidence establishes, beyond question, the legal title of the complainant. His possession is not denied by the answer, is fully proved by the depositions, and is incontestable.

The origin of the defendant's pretended claims was between thirty and forty years after the date of Clark's patent, and about half a century after Clark's survey was registered in the proper office of the state of Virginia, from whose laws his title originally emanated.

Here the case ends. It is necessary to look no further to embrace its whole merits as a legal controversy; and the conclusion is clear and obvious in favour of the complainant, both on general principles, and on the terms of the act of Assembly under which the bill is filed. In accordance with this are the cases of Starling, &c. vs. Hardin, 2 Bibb. 522; and Loftus vs. Cates, 1 Monroe, 98; in the first of which it is expressly said that, in a contest with those who have no title originating anterior to the patent, no other evidence of title than the patent need be produced.

But the defendant has gone altogether beyond those limits, and proposes to litigate questions that, in our opinion, do not belong to or arise in the case. He contends that the land was not subject to appropriation by Clark's warrants at the date of his entry, and that, therefore, his claim is null and void.

It will not be denied that the land in question was within the territorial limits of the state of Virginia, until the separation of Kentucky placed it under the jurisdiction of the latter state. Virginia had, then, the right to dispose of it according to her policy or pleasure.

By the act of 1779 (1 Litt. 408) her whole unappropriated territory was thrown open for individual appropriation by treasury warrants, with these only exceptions: that "no entry or location shall be admitted within the country and limits of the Cherokee Indians, or on the north-west side of the Ohio river, or on the lands reserved by act of Assembly for any particular nation or tribe of Indians, or on the lands granted by law to Richard Henderson and Co., or in that tract of country reserved by resolution of the General Assembly for the benefit of the troops serving in the present war, and bounded by the Green river, and south-east coast, from the head

B 2

thereof to the Cumberland mountains, with said mountains to the Carolina line, with the Carolina line to the Cherokee or Tennessee river, with the said river to the Ohio river, and with the Ohio to the said Green river, until the further order of the General Assembly."

This was the only restriction upon Clark's right to locate his warrants anywhere within the territorial limits of Virginia. His entries were made below the Tennessee river, and in the year 1780. They did not include any part of the excepted territories. Most clearly they did not interfere with the military reserve. It is true, that after Clark's entries at the November session, 1781, (1 Litt. 432,) the Virginia Legislature enlarged the military reserve, by adding to it the country below the Tennessee, including the land now in suit. But it will scarcely be contended that this act could affect, or was intended to affect, the previously acquired and vested rights of Clark; while it clearly shows that the legislature considered itself as having full power to dispose of this additional reserve; and that without this reservation the land would have been, and before it was, subject to individual appropriation. The only purpose of the reservation was to exempt it from such appropriation, to which it was then liable.

The decision in the case of the Superintending Officers *vs.* Clark, Hughes's Repts. 39, is a direct adjudication that the land was subject to appropriation by Clark's entries.

Neither in 1779, nor at any time since, has either the government of the United States, or Virginia, or Kentucky, ever recognised the land now in suit as embraced either by the limits of the Cherokee Indians, or within the limits of any reservation made by any act of Assembly, for any nation or tribe of Indians. At least, we know of no such recognition. Let the defendant show it. The treaties with the Cherokee Indians show that they were never considered as owning the country where this land lies. (See those treaties, 1 vol. Laws of the United States, 322, et seq.) On the contrary, the Indian title to the country below the Tennessee river was supposed to be extinguished by the treaty of 1818, made with the Chickasaw Indians, by Shelby and Jackson, as commissioners.

And in several acts of the Kentucky legislature, Stat. Law, 1040 and 915, the country below the Tennessee is recognised as land that was within the " Chickasaw Indian boundary." The land in question certainly does not lie within Henderson's grant, which is at the mouth of Green river.

Upon the whole, we conclude that Clark's claims, at the date of their location, in 1780, were not within any of the limits or territories exempted and excepted from appropriation by the act of 1779; and, consequently, that the land in question was legally subject to appropriation, and was legally appropriated by Clark's entries.

But suppose those entries, and survey or surveys, were made without sanction of law, and upon lands excepted or reserved from appropriation by them, was it not competent for Virginia and Kentucky, the successive sovereign owners of the country, to waive any

objection to such irregularities? And when afterwards the title, however irregular in its inception and progress, was consummated, by patent from the state; is not that, at least, prima facie evidence of such waiver on the part of the state, and is it not conclusive upon all persons subsequently acquiring title from the state? To us it seems that all these questions must be answered in the affirmative.

There are numerous decisions by the Court of Appeals of Kentucky, that certificates for land, granted by commissioners or by county Courts, are conclusive upon the state, and upon all parties subsequently acquiring a claim from the state; and that such subsequent claimants cannot impeach or inquire into the prior certificates. These decisions seem to have a decided bearing upon the present case; and the principle of them must equally exclude the defendant from questioning or impeaching the patent under which the complainant claims. The decisions alluded to are so numerous and well known that it would be idle parade to cite them: it is a well settled doctrine, too, that one claiming under an entry, &c. originating subsequent to a patent on the same land, cannot avail himself of any defect or irregularity in the entry or survey of the prior patentee. Ward and Kenton *vs.* Lee and Orr, 1 Bibb, 33; Fitche's devisees *vs.* Bullock, 1 Bibb, 229; and in Hardin's Reports, Greenup *vs.* Kenton, 15; Patterson *vs.* Bradford, 105; and Jasper *vs.* Quarles, 469, &c.

But if all these analogies, principles, and precedents should fail us, we contend that the legislative authority has sanctioned and made good the survey of Clark, whatever defect or objection previously existed in or to it, or the entry on which it was founded.

It will be seen, by the register's certificate, that the survey was registered "in the register's office of Virginia," at the time of, and before, the separation of Kentucky from that state. By the act of 1794, it was enacted by the legislature of Kentucky, "that the register of this state shall receive and issue grants on all certificates of survey which were in the register's office of Virginia at the time the separation took place, and on which grants have not issued." Stat. Law, 910.

Acting in the same spirit of sound policy and good faith towards Virginia claimants, this state, in the year 1811, enacted that all claims, founded on the laws of this commonwealth, which interfered with "any survey or grant, surveyed or granted under or by virtue of any law of Virginia, &c., shall be void," &c. Stat. Law, 915. See, also, the act of 1792, 1 Litt. 75. 159.

Clark's survey comes completely within the protection and ratification conferred by these statutes.

If a distinction be attempted between the claim of the defendant and claims on Virginia treasury warrants, on the ground that the latter were expressly confined to "unappropriated land," it is answered, first, that these words are mere expletives, used out of abundant caution, and that the construction must have been the same,

if these words had not been used; second, that the ground of the distinction does not, in fact, exist; the act of 1825, sec. 2, p. 1054, Stat. Law, authorizing the receiver to expose to sale only the "unappropriated sections," &c. It is inferred, therefore, that it could not have been intended that purchases by private entries should have been made of any but "unappropriated sections." The whole country had been sectionized, and it was well known to, and recognised by the legislature that much of it had been appropriated; and it is but common respect to its justice to suppose that it designed this as an express and abundantly cautious saving of all individual rights and claims.

Upon the hearing of the cause in the Court below, the Court, both judges concurring, were of opinion that the complainant, Clark, had the legal title to the land in question, and was in the actual possession thereof at the commencement of this suit; and yet the Court refused to decree the defendant to relinquish his pretended claim, because of a division of opinion with the judges, as to the jurisdiction of the Court. One of the judges was of opinion that, although the case came completely within the provisions of the act of Assembly of Kentucky, giving jurisdiction to Courts of equity in such cases, still that the federal Court could not exercise that jurisdiction; that its jurisdiction was limited by the "general principles" of the equity jurisdiction of the Courts of the United States; and that the case not being embraced by those general principles, the Court could not exercise a jurisdiction created by an act of Assembly of Kentucky. In consequence of this division of opinion, the complainant's bill was dismissed; and he has appealed to this Court, and will insist that the Circuit Court had jurisdiction of the case, and ought to have exercised it by decreeing in favour of the complainant, and that it erred in dismissing his bill. 7 Peters, 542.

Mr. Justice CATRON delivered the opinion of the Court.

By patent of the 15th September, 1795, there was granted to George Rogers Clark, by the commonwealth of Kentucky, 36,962 acres of land, beginning on the Ohio river, at the mouth of the Tennessee; running south 16°, east 1280 poles, north 74°, west 3840 poles, north 16°, east 1800 poles, to the bank of the Ohio, about three miles below Fort Massac; thence running up the Ohio, with its several meanders 4480 poles to the beginning.

The patent is in conformity to a survey of 7th June, 1784, returned to the land office of Virginia; founded on an entry, and an amendment thereof, dated 17th May, and 26th of October, 1780; made by virtue of various treasury warrants. The entry having been for 71,962 acres, with liberty to return one or more surveys.

The identity of the land, as entered, surveyed, and patented, is established beyond doubt, as the survey made by order of the Court below, represents it.

William Clark, the complainant, by various mesne conveyances, became the owner in fee of the same; and, by his tenant, has

[Clark et al. *vs.* Smith.]

been in possession from 1819, up to the time of filing the bill: the claim of the Chickasaw Indians, having been extinguished to the country where the land lies, by the treaty of the 19th of October, 1818; to which time the right of possession was necessarily suspended.

The first exception taken by the answer is, that the patent was made for lands lying within a country claimed by Indians; and, therefore, void.

To which it may be answered, that the colonial charters, a great portion of the individual grants by the proprietary and royal governments, and a still greater portion by the states of this Union after the Revolution, were made for lands within the Indian hunting grounds. North Carolina, and Virginia, to a great extent, paid their officers and soldiers of the revolutionary war, by such grants; and extinguished the arrears due the army by similar means. It was one of the great resources that sustained the war, not only by these states but others. The ultimate fee (encumbered with the Indian right of occupancy) was in the crown previous to the Revolution, and in the states of the Union afterwards, and subject to grant. This right of occupancy was protected by the political power, and respected by the Courts until extinguished; when the patentee took the unencumbered fee. So this Court, and the state Courts, have uniformly, and, often, holden. 6 Cranch, 87. 9 Cranch, 11.

By the act of November, 1781, Virginia opened the whole country south of the Tennessee river, for the satisfaction of military claims, and excluded the location of treasury warrants; and the officers and soldiers, through their superintendents, Thomas Marshall and others, caveated George Rogers Clark's claim, praying no grant might issue to him for the 36,932 acres. The caveat was filed in the Supreme Court of the district of Kentucky; but because the judges were interested in the event, the suit was transferred, pursuant to an act of Assembly, to the Court of Appeals of Virginia, where it was pending from 1786 to 1791; when that Court, amongst other things, held, " that the dormant title of the Indian tribes remained to be extinguished by the government, either by purchase or conquest; and when that was done, it enured to the benefit of the citizens who had previously acquired a title from the crown, and did not authorize a new grant of the lands, as waste and unappropriated." And the state having succeeded to the royal rights, could appropriate the waste lands within her chartered limits in the same manner.

2. That by the act of 1779, the lands south of Tennessee river, were subject to be located by treasury warrants; and that the act of 1781, for the benefit of the officers and soldiers, could not have a retrospective operation so as to defeat General Clark's prior entry, made according to the existing laws.

The opinion having been returned to the Court of Appeal of Kentucky, at the October term thereof, 1793, the caveat was dismissed;

26

and in September, 1795, General Clark obtained his patent. Hughes' Kentucky Reports, 39.

The validity of the title of the complainant, is, therefore, not now open to controversy on these grounds; and such was the opinion of the Circuit Court. But that Court being divided in opinion on the question of jurisdiction, no decree could be made, in conformity to the prayer of the bill, and which was dismissed for this reason.

It seeks to enforce the act of Kentucky of 1796, which provides, that "any person having both legal title to and possession of land, may institute a suit against any other person setting up a claim thereto; and if the complainant shall be able to establish his title to such land, the defendant shall be decreed to release his claim thereto, and pay the complainant his costs, unless the defendant shall by answer disclaim all title to such lands, and offer to give such release to the complainant: in which case, the complainant shall pay to the defendant his costs, except for special reasons appearing, the Court should otherwise decree."

The foregoing extract is the twenty-ninth section of an act professedly regulating proceedings in the Courts of Chancery.

Conflicts of title were unfortunately so numerous that no one knew from whom to buy or take lands with safety; nor could improvements be made without great hazard, by those in possession, who had conflicting claims hanging over them; and which might thus continue for half a century—the writ of right being limited to fifty years in some cases; that is, where it was brought upon the seisin of an ancestor, or predecessor, and to thirty years, if on the demandant's own seisin. Act of January 1796. During all which time, the party in possession had no power to litigate, much less to settle the title at law; for he might be harrassed by many actions of ejectment, and his peace and property destroyed, although always successful; by no means an uncommon occurrence. This evil, it was the object and policy of the legislature to cure; not so much by prescribing a mode of proceeding, as by conferring a right on him who had the better title, and the possession, to draw to him the outstanding inferior claims. It is, in effect, declared that the junior claimant shall be deemed to hold a trustee for him in possession, and be compelled to release his inferior title by a conveyance, so that the junior patent, for instance, could not be perfected by possession, and the lapse of time into the better right; (by force of the acts of limitation;) now reduced in Kentucky, in such cases, to a seven years' adverse holding. The junior patent, as between the state and the grantee is a valid title; and if in this instance, Smith were to hold adverse possession of any one of his thirty-two tracts, for seven years, he would have the better legal title: and if the grants of Smith are released to Clark, a holding by him in virtue of the release, would have the same effect.

The legislature having declared that he who has the legal and equitable title, and the possession, may treat the adverse claimant as a trustee, and coerce a release to himself of the inferior claim;

[Clark et al. vs. Smith.]

of course the statute secures a highly valuable right; which it is the duty of the Courts to enforce, and which can only be enforced in a Court of Equity.

Kentucky has the undoubted power to regulate and protect individual rights to her soil, and to declare what shall form a cloud on titles; and having so declared, the Courts of the United States, by removing such clouds, are only applying an old practice to a new equity created by the legislature, having its origin in the peculiar condition of. the country. The unappropriated lands of that state have been opened to entry and grant at a very cheap rate, as this record shows; which policy has let in the abuse, sought to be remedied by the bill. That clouds upon old titles, by the issuance of new patents for the same lands, would be the consequence, was manifest; and that citizens of other states are entitled to come into the Courts of the United States, to have the rights secured to them by the statute of 1796, enforced, we cannot doubt.

But we apprehend, jurisdiction may be assumed by the federal, equally with the state Courts, upon another ground. Kentucky may prescribe any policy for the protection of the agriculture of the country that she may deem wise and proper; she has in effect declared, that junior patents, issued for previously granted lands, shall be delivered up and cancelled; with the addition, that a release of title shall be executed: and it is the duty of the Courts to execute the policy.

Where the legislature declares certain instruments illegal and void, as the British annuity act does; or as the gaming acts do; there is inherent in the Courts of Equity a jurisdiction to order them to be delivered up, and thereby give effect to the policy of the legislature. 10 Ves. 218. 5 Ves. 604. 2 Yerger's Rep. 524. 1 Maddock's Ch. Pra. 185, and authorities cited.

The state legislatures certainly have no authority to prescribe the forms and modes of proceeding in the Courts of the United States; but having created a right, and at the same time prescribed the remedy to enforce it, if the remedy prescribed is substantially consistent with the ordinary modes of proceeding on the Chancery side of the federal Courts, no reason exists why it should not be pursued in the same form as it is in the state Courts; on the contrary, propriety and convenience suggest, that the practice should not materially differ, where titles to lands are the subjects of investigation. And such is the constant course of the federal Courts, For instance, in Tennessee, the legislature has provided that the Courts of Equity may divest a title, and vest it in another party to the suit; and that the decree shall operate as a legal conveyance. So in Kentucky, the legislature has declared that the Courts may appoint a commissioner to convey as the attorney in fact of a litigant party; and that such deed shall pass the title: in both instances binding infants and femes covert, if necessary. The federal Courts, in the states referred to, have adopted the same practice for many years, without a doubt having been entertained of its propriety. It may be said

with truth, that this is a mode of conveyance and of passing title, which the states have the exclusive right to regulate; still the same statute that conferred the power thus to decree a conveyance, prescribed the mode of proceeding; and had the form of the remedy been rejected by the Courts of the United States, the right to have such record conveyance would have fallen with it, as they could not be separated.

The undoubted truth is, that when investigating and decreeing on titles in this country, we must deal with them, in practice, as we find them, and accommodate our modes of proceeding in a considerable degree, to the nature of the case, and the character of the equities involved in the controversy; so as to give effect to state legislation and state policy: not departing, however, from what legitimately belongs to the practice of a Court of Chancery.

The complainant's case being one coming clearly within the rules alluded to; we order that the decree of the Court below be reversed, and the cause remanded to be proceeded in according to the rights of the parties.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States, for the District of Kentucky, and was argued by counsel. On consideration whereof, it is adjudged and decreed by this Court, that the decree of the said Circuit Court, in this cause be, and the same is hereby, reversed, with costs, and that this cause be, and the same is hereby, remanded to the said Circuit Court, for further proceedings to be had therein, in conformity to the opinion of this Court.