UNITED STATES of America, Plaintiff,

v.

**LOCAL 282 OF THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS, Executive Board of Local 282, Robert Sasso, Michael Carbone, Michael Bourgal, John Probeyahn and Joseph Matarazzo, Defendants.**

No. CV–94–2919 (TCP).

United States District Court,
E.D. New York.

July 31, 1998.

Stephen J. Riegel, Asst. U.S. Atty., Brooklyn, NY, for U.S.

Charies G. Slepian, New York City, for Robert Sasso.

### MEMORANDUM AND ORDER

PLATT, District Judge.

The government seeks an order from this Court requiring defendant Robert Sasso to pay at least $400,000 for the monitorship of Local 282 to date and a four-year extension it hopes to obtain. The Court, however, is reluctant to anticipate costs beyond the present monitoring period.

### Background

In 1982 Sasso began his tenure as an officer of Local 282 of the International Brotherhood of Teamsters, a union which entered into collective bargaining agreements for its truck drivers. By the time he retired in 1992, Sasso had held the positions of business agent, vice president, secretary-treasurer, and president. In 1994 Sasso pleaded guilty to a criminal Racketeer Influenced and Corrupt Organizations Act ("RICO") conspiracy count based upon his activities as an official in Local 282.

In his plea, Sasso admitted that he used his position as a union officer to unlawfully demand and collect cash payoffs and payments from representatives of companies falling under the jurisdiction of Local 282. These payments were coerced by the use of fear of "physical, economic, and financial harm."

Sasso further admitted he was "an associate" of the Gambino Organized Crime Family of La Cosa Nostra ("the Gambino Crime Family") and that he worked with the Gambino Crime Family "to reap financial gain." Sasso's plea evidences that the Gambino Crime Family profited from its relationship with Sasso and Local 282. Union officials shared proceeds illegally collected through union activities with the Gambino Crime Family. Additionally, companies which were associated with the Gambino Crime Family received favorable treatment by the union at the expense of competitors.

Sasso's plea also details several specific acts of extortion and racketeering. He admitted that in or about the early 1980's "he did knowingly, willfully and unlawfully request, demand, receive and accept, and agree to receive and accept, more than $1,000" from representatives of eight different corporations. His plea also evidences that he engaged in an extortion conspiracy. The members of this conspiracy wrongfully used fear to obtain money from several corporations.

At sentencing, the Court sentenced Sasso to a term of imprisonment of forty-one months. The Court also charged Sasso with the costs of his incarceration, $51,172, and imposed a criminal fine of $7,500, the minimum allowed under the guidelines. The Court leniently fined Sasso because Sasso faced large monetary punishments in the pending civil RICO action.

Based on Sasso's plea, the Court granted summary judgment in the civil RICO action to the extent of finding Sasso liable in that he "conspired with the other individual defendants and members of organized crime to conduct the affairs of defendant [Local 282] of the [International Brotherhood of Teamsters] as an enterprise through a pattern of labor racketeering activities, including acts of extortion and illegal receipt of money from employers, from the late 1970s through 1991 in violation of 18 U.S.C. § 1962(c)." The Court permanently enjoined Sasso from owning, operating, or working for any business in the construction, demolition, or excavation industries or part of the trucking industry which was engaged in construction, demolition, or excavation. The Court also enjoined Sasso from working in any capacity for any person or business doing business with the construction, demolition, or excavation industries and from associating for any commercial purpose with any member or associate of organized crime. Furthermore, Sasso was enjoined from visiting the work sites of the International Brotherhood of Teamsters and, with limited exceptions, communicating with any person at these sites.

In January 1995, a Consent Judgment in this civil action created a monitorship over Local 282. The government now requests the Court to order Sasso to contribute an equitable amount to the funding of that monitorship. Since its creation, the monitorship has expended approximately $681,000. It is estimated that the monitorship will spend an additional $225,000 by May 1999, the time originally projected for the end of the monitorship's appointment.

## Discussion

■ Under RICO § 1964(a), district courts have jurisdiction to "prevent and restrain violations of [RICO] by issuing appropriate orders." 18 U.S.C. § 1964(a) (1994). Appropriate orders are "forward looking ... and calculated to prevent RICO violations in the future." *United States v. Carson,* 52 F.3d 1173, 1181 (2d Cir.1995). The Supreme Court recognized district courts' ample discretion in designing remedies under RICO when it noted that RICO should be " 'liberally construed to effectuate its remedial purpose.' " *Sedima v. Imrex Co., Inc.,* 473 U.S. 479, 498, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) quoting Pub.L. 91–452, § 904(a), 84 Stat. 947. Additionally, courts' broad powers to fashion appropriate equitable remedies under § 1964(a) is evidenced by the section's legislative history which indicates that "the equitable relief available under RICO is intended to be 'broad enough to do all that is necessary.' " *Carson,* 52 F.3d at 1181, quoting S.Rep. No. 91–617, at 79 (1969).

Under the powers granted by section 1964(a), district courts have established monitorships over unions to eliminate corruption. *See United States v. Local 295 of Int'l. Bhd. of Teamsters,* 784 F.Supp. 15, 22 (E.D.N.Y. 1992) (appointing a trustee to supervise the actions of a corrupt union); *see also United States v. Local 560, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen, and Helpers of America,* 581 F.Supp. 279, 321 (D.N.J.1984) (granting trustees the power to administer a corrupt union during a curative period), *aff'd,* 780 F.2d 267, 296 (3d Cir.1985).

■ Defendants in a RICO civil action may be ordered to fund a monitorship. *See United States v. Private Sanitation Indus. Ass'n of Nassau/Suffolk,* 914 F.Supp. 895, 901 (E.D.N.Y.1996); *see also Local 560,* 731 F.Supp. at 1208, *supra.* In the latter case, Judge Ackerman supported his conclusion

that a defendant Local pay for a monitorship by reasoning that if courts could not order defendants to pay for monitorships, potential plaintiffs might be deterred from seeking monitorships over corrupt organizations. *See id.*

The broad discretion in fashioning remedies granted by section 1964(a) affords this Court the power to order Sasso to fund the monitorship which the Consent Judgment created. Ordering Sasso to fund the monitorship does not violate the restraints on district courts' powers under § 1964(a) emphasized in *Carson, supra.* In *Carson,* the Second Circuit warned that district courts have the power to " 'prevent and restrain' *future* conduct" but not the power to "punish *past* conduct." *Carson,* 52 F.3d at 1182 (emphasis in original). The Second Circuit held that the *Carson* district court overstepped its jurisdiction by ordering Carson to disgorge profits he illicitly acquired eight years before the launch of the civil suit. *Id.* at 1182. Carson's profits were garnered "too far in the past to be part of an effort to 'prevent' and 'restrain *future* conduct.' " *Id.* (emphasis in original).

Here, in contrast, the plaintiff does not request that Sasso disgorge profits. Rather, plaintiff only moves the Court to order Sasso to contribute to the funding of the monitorship. As Judge Glasser noted, funding a monitorship furthers the prevention and the restraint of future illegal conduct. *See Private Sanitation Indus. Ass'n,* 914 F.Supp. at 901, *supra.* Here, there is no question that additional funding for the Local 282 monitorship will help prevent the illegal conduct Sasso fostered at Local 282. Indeed, the monitorship in this case was created for the express purpose of eradicating the possibility of future labor racketeering by Local 282 officials. Additionally, funding the monitorship will further prevent future illegal conduct by Sasso. Sasso will be deterred from engaging in labor racketeering because a fully funded monitorship is difficult to evade.

### Conclusion

Given all of the former and present facts, the Court feels defendant should bear approximately fifteen (15%) percent of the costs of this first period, or $136,000, at this time, without prejudice to a future application by the government if an extension of the monitoring period is granted.

SO ORDERED.