**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Robert SASSO, Defendant–Appellant,**

Local 282 of the International Brotherhood of Teamsters, Executive Board Of Local 282, Michael Carbone, Michael Bourgal, John Probeyahn and Joseph Matarazzo, Defendants.

Docket No. 98–6240

United States Court of Appeals,
Second Circuit.

Argued: Sept. 22, 1999
Decided: June 13, 2000

Stephen J. Riegel, Assistant United States Attorney, Brooklyn, New York (Zachary W. Carter, United States Attorney for the Eastern District of New York, Deborah B. Zwany, Assistant United States Attorney, Brooklyn, New York, on the brief), for Plaintiff–Appellee.

Charles G. Slepian, New York, New York (Abraham Abramovsky, Jonathan I. Edelstein, New York, New York, on the brief), for Defendant-Appellant.

Before: OAKES, KEARSE, and CABRANES, Circuit Judges.

KEARSE, Circuit Judge:

Defendant Robert Sasso appeals from an amended judgment of the United States District Court for the Eastern District of New York, Thomas C. Platt, *Judge*, ordering him to contribute $136,000 toward the cost of monitoring the operations of defendant Local 282 of the International Brotherhood of Teamsters ("Local 282"). The district court granted the government's motion to compel such contribution in light of, *inter alia*, Sasso's association with organized crime and his participation in a conspiracy to conduct the affairs of Local 282 through a pattern of racketeering activity, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* (1994). On appeal, Sasso contends principally that the court (1) lacked authority to order contribution, and (2) failed to make factual findings sufficient to support the amount of contribution ordered. For the reasons that follow, we reject all of Sasso's challenges to liability, but we vacate and remand for findings with respect to the amount of contribution to be paid.

## I. BACKGROUND

In 1992, the government commenced a criminal prosecution against defendants Michael Carbone, Michael Bourgal, John Probeyahn, Joseph Matarazzo, and Sasso (collectively the "individual defendants"), charging them with, *inter alia*, conspiring to conduct the affairs of Local 282 through a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1962(c) and (d). In March 1994, Sasso pleaded guilty to that conspiracy charge; he was sentenced principally to 41 months' imprisonment, followed by three years' supervised release, and was ordered to pay a $7,500 fine, plus $51,172 for the costs of his imprisonment.

Insofar as the present appeal is concerned, most of the events described below were established by Sasso's plea of guilty. *See* 18 U.S.C. § 1964(d) ("A final judgment or decree rendered in favor of the United States in any criminal proceeding brought

by the United States under this chapter shall estop the defendant from denying the essential allegations of the criminal offense in any subsequent civil proceeding brought by the United States."); *see generally United States v. Podell,* 572 F.2d 31, 35 (2d Cir.1978) ("a criminal conviction, whether by jury verdict or guilty plea, constitutes estoppel in favor of the United States in a subsequent civil proceeding as to those matters determined by the judgment in the criminal case"); *United States v. Smith,* 407 F.2d 33, 35 (2d Cir.1969) ("a plea of guilty admits all facts well pleaded").

## A. *The Present Civil RICO Action and the Events Leading to It*

Local 282 is a labor organization representing, among others, truck drivers and other transporters of building materials and equipment to and from construction sites in the New York City metropolitan area. At the pertinent times, the individual defendants were officers of Local 282. Between the late 1970s and the early 1990s, by means of threats of physical, economic, and financial harm, including work stoppages, the individual defendants unlawfully obtained cash payments from representatives of companies whose employees were members or were eligible to be members of Local 282. Such companies were assured of lax enforcement of their agreements with Local 282 or were allowed to operate in the absence of a collective bargaining agreement without experiencing labor unrest.

Sasso was an officer of Local 282 from 1968 to 1992, holding at various times the positions of business agent, vice-president, and secretary-treasurer, and serving as its president from 1984 to 1992. Sasso was also an associate of the Gambino Organized Crime Family of La Cosa Nostra ("Gambino Crime Family" or "Gambino Family"), part of a nationwide criminal organization. Sasso and the other individual defendants shared the unlawful payments described above with members and associates of the Gambino Crime Family. In addition, companies affiliated with the Gambino Family received favorable treatment at the expense of their competitors, and official positions within Local 282 were filled with persons favored by the Gambino Family. The individual defendants also engaged in conduct designed to prevent government detection of their unlawful collaboration with the Gambino Family by, *inter alia,* accepting illegal payments in cash, arranging clandestine meetings, transferring money surreptitiously, and lying during depositions taken under oath.

In June 1994, the government commenced the present civil action against Local 282 and the individual defendants pursuant to 18 U.S.C. § 1964, which authorizes the district court to issue appropriate orders to prevent or restrain violations of RICO. The complaint, *inter alia,* alleged a 25-year history of "systemic infiltration, control and corruption" of Local 282 by members of the Gambino Crime Family (Complaint ¶ 1), reiterated the allegations of the count of the indictment to which Sasso had pleaded guilty, and set out 44 acts of racketeering activity. The principal difference between the civil complaint and the criminal indictment was that, whereas in the criminal case the RICO enterprise had been defined as Local 282, in the civil RICO action the enterprise was defined as the "Local 282/Gambino Enterprise." The complaint asserted two claims, alleging that each individual defendant (1) had conducted the affairs of the Local 282/Gambino Enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c), and (2) had conspired to do so, in violation of 18 U.S.C. § 1962(d). The complaint sought equitable relief designed to "eliminate and enjoin organized crime's control, infiltration and corruption of Local 282, to prevent Local 282's and organized crime's extortion of construction businesses, and to have the Individual Defendants divest and disgorge any interests and proceeds they have received from the enterprise described here-

in." (Complaint ¶ 2.) It also asked that the court "appoint a trustee ... to assume control of and direct all operations of defendant Local 282 until such time as Local 282 is cleaned of all racketeering or organized crime influence" (Complaint Wherefore ¶ F), and eventually to conduct elections of new officers free of intimidation and corruption.

In early 1995, the government, Local 282, and the Local's parent union, International Brotherhood of Teamsters ("IBT"), entered into a Consent Judgment calling for the establishment of a monitorship to oversee Local 282's activities and to eliminate corruption within the Local. It provided for IBT, subject to approval by the government and the district court, to appoint a Trustee for the Local (the "IBT Trustee"); and it established procedures for the selection of a Corruption Officer by IBT, the government, and the court, and for the selection of a Corruption Counsel by the government and the court.

The Consent Judgment also provided that the expenses of the Corruption Officer, not to exceed $100,000 for the first year and $87,500 for each succeeding year, were to be funded from settlement payments made by individual defendants, augmented periodically by payments from Local 282 to bring the fund to the level of $100,000. By the time of the Consent Judgment, Carbone had settled the government's civil RICO claims against him, and some $92,000 had been deposited into the fund.

B. *The Motion To Compel Contribution by Sasso*

In June 1997, the government moved for summary judgment against Sasso, seeking disgorgement of his ill-gotten gains, an injunction barring him from any involvement in union activities or in the local construction, demolition, and trucking industries, and an order requiring him to pay an equitable share of the funding of the monitorship. In support of its motion, the government submitted, *inter alia*, dec-

larations of Corruption Officer Robert A. Machado describing activities of Sasso during his incarceration from January 1996 to March 1997. Records of visitors and telephone calls showed that Sasso had, *inter alia*, received visits from several persons believed to be associated with members of organized crime; made numerous telephone calls to a Local 282 on-site steward and other persons who were associated with the Local; and placed more than 50 calls to a business that had a collective bargaining agreement with Local 282 and whose owners had previously made illegal payments to Local 282 officials.

In support of its request for an order requiring Sasso to contribute to the expenses of the monitorship, the government stated as follows:

It is well-established that federal courts not only have the authority under § 1964(a) to order the independent monitorship of a union or a business to eliminate corruption and organized crime control, but have the concomitant power to order which parties shall pay for the costs and expenses of the monitorship.... The evidence in support of the current motion establishes that defendant Sasso, before his indictment in 1992, was the highest-ranking and most powerful person in Local 282 engaged in the racketeering activities described in the complaint, was organized crime's "representative" in charge of the local and had close ties with the highest members of the Gambino Crime Family, and was receiving a large share of the proceeds from the extortion, bribery and other illegal activities he engaged in with organized crime members.

As such, of all the individual defendants, Sasso is the most responsible for and in turn most benefited from the corrupt activities and organized crime's control in Local 282, which the government, the IBT and the Corruption Officer and Corruption Counsel appointed by this Court are now engaged in a lengthy, expensive and comprehensive

effort to eradicate. As a part of the monitoring of Local 282, the Corruption Officer has had to expend time and resources to investigate Sasso's contacts with Local 282 members and construction industry employers, and to take appropriate actions.... It would simply be fair and just for defendant Sasso to be required to pay a substantial amount to fund the current monitorship of Local 282.

(Government's Memorandum of Law in Support of Its Motions for Summary Judgment on the RICO Claim Against Individual Defendant Sasso and for Injunctive and Other Equitable Relief Against Him, at 23–24.)

In an order dated January 5, 1998, the district court stated that further proof should be presented with respect to the government's first claim for relief, but it granted summary judgment on the second claim, finding that Sasso had engaged in the alleged RICO conspiracy. The court permanently enjoined Sasso from, *inter alia*, (1) owning, operating, or working for any business that engaged in, or any part of the trucking industry that engaged in, construction, demolition, or excavation; (2) belonging to or doing business with Local 282 or any other labor organization; and (3) associating for any commercial purpose with any member or associate of organized crime. The court referred the government's requests for disgorgement and contribution to a United States magistrate judge for further discovery proceedings.

In July 1998, the government renewed its request that Sasso be ordered to contribute to the funding of the monitorship. The government submitted Sasso's plea of guilty to the criminal RICO charge and resubmitted, *inter alia*, the declarations of Machado describing Sasso's activities while incarcerated. It also submitted a declaration by the IBT Trustee stating that the monitorship had thus far expended nearly $681,000; that expenditures totaling $225,000 more were expected before the scheduled end of the monitorship in May 1999; and that an anticipated proposal for a four-year extension of the monitorship envisioned an additional cost of $800,000. The government stated that other individual defendants had contributed a total of $209,500 toward the funding of the monitorship as part of their respective settlement agreements. The government requested that Sasso be ordered to contribute $400,000.

In opposition to the renewed motion for contribution, Sasso argued that the government had failed to prove that he engaged in the racketeering activities alleged in the civil complaint, that RICO does not permit a civil defendant to be required to fund a monitorship, that the government lacked standing to request such relief, that the declarations submitted by the government were irrelevant, and that the remedy was punitive and thus barred by the Double Jeopardy Clause of the Fifth Amendment. He argued that the relief requested by the government would be contrary to this Court's decision in *United States v. Carson,* 52 F.3d 1173 (2d Cir.1995) ("*Carson*"), *cert. denied,* 516 U.S. 1122, 116 S.Ct. 934, 133 L.Ed.2d 861 (1996).

In a Memorandum and Order dated July 31, 1998, published at 13 F.Supp.2d 401, the district court granted the government's motion to the extent of ordering Sasso to pay $136,000 toward the funding of the monitorship. The court rejected Sasso's contention that the government had failed to prove the allegations that he engaged in racketeering activity, pointing out that the court had already granted summary judgment against him in light of the admissions contained in his plea of guilty. In that plea, Sasso had admitted, *inter alia,* using his position as a union officer to demand and collect unlawful payments, using fear of physical, economic, and financial harm to coerce those payments, engaging in racketeering activity, and being an associate of the Gambino Crime Family for the purpose of reaping financial gain.

The court also rejected Sasso's contention that a contribution of the type requested by the government was not authorized under RICO and was foreclosed by *Carson:*

> Under RICO § 1964(a), district courts have jurisdiction to "prevent and restrain violations of [RICO] by issuing appropriate orders." 18 U.S.C. § 1964(a) (1994). Appropriate orders are "forward looking . . . and calculated to prevent RICO violations in the future." *United States v. Carson*, 52 F.3d 1173, 1181 (2d Cir.1995). The Supreme Court recognized district courts' ample discretion in designing remedies under RICO when it noted that RICO should be " 'liberally construed to effectuate its remedial purpose.' " *Sedima v. Imrex Co., Inc.*, 473 U.S. 479, 498, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) quoting Pub.L. 91–452, § 904(a), 84 Stat. 947. Additionally, courts' broad powers to fashion appropriate equitable remedies under § 1964(a) is evidenced by the section's legislative history which indicates that "the equitable relief available under RICO is intended to be 'broad enough to do all that is necessary.' " *Carson*, 52 F.3d at 1181, quoting S.Rep. No. 91–617, at 79 (1969).

> Under the powers granted by section 1964(a), district courts have established monitorships over unions to eliminate corruption. *See United States v. Local 295 of Int'l. Bhd. of Teamsters*, 784 F.Supp. 15, 22 (E.D.N.Y.1992) (appointing a trustee to supervise the actions of a corrupt union); *see also United States v. Local 560, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen, and Helpers of America*, 581 F.Supp. 279, 321 (D.N.J.1984) (granting trustees the power to administer a corrupt union during a curative period), *aff'd*, 780 F.2d 267, 296 (3d Cir.1985).

⁙

> The broad discretion in fashioning remedies granted by section 1964(a) affords this Court the power to order Sasso to fund the monitorship which the Consent Judgment created.

13 F.Supp.2d at 402–03. The court emphasized that the contribution order was not tantamount to an order for disgorgement of past ill-gotten gains but rather was relief that was forward-looking:

> funding a monitorship furthers the prevention and the restraint of future illegal conduct. . . . Here, there is no question that additional funding for the Local 282 monitorship will help prevent the illegal conduct Sasso fostered at Local 282. Indeed, the monitorship in this case was created for the express purpose of eradicating the possibility of future labor racketeering by Local 282 officials. Additionally, funding the monitorship will further prevent future illegal conduct by Sasso. Sasso will be deterred from engaging in labor racketeering because a fully funded monitorship is difficult to evade.

*Id.* at 403.

As to the amount that Sasso should contribute, the court stated as follows:

> Given all of the former and present facts, the Court feels defendant should bear approximately fifteen (15%) percent of the costs of this first period, or $136,000, at this time, without prejudice to a future application by the government if an extension of the monitoring period is granted.

*Id.*

A partial final judgment was entered reflecting these rulings. Thereafter, following the entry of an Amended Consent Judgment extending the monitorship for an additional four years, and a stipulation dismissing the government's remaining claims against Sasso, the district court entered the amended final judgment pursuant to Fed.R.Civ.P. 54(b), resolving all claims in this action against Sasso.

## II. DISCUSSION

On appeal, Sasso, still relying largely on *Carson*, contends principally that

§ 1964(a) does not authorize the court to order a retired union officer to contribute to the funding of a union monitorship. He also argues, *inter alia*, that the government lacked standing to seek a contribution order and that the district court made insufficient factual findings to support the conclusion that he should pay 15 percent of the monitorship cost. For the reasons that follow, we conclude that a contribution order was a permissible exercise of the court's discretion. However, we remand for further findings as to the appropriate amount of contribution by Sasso.

### A. Authority Under RICO To Order Contribution

█ Section 1964(a), pursuant to which the district court ordered Sasso's contribution, provides as follows:

> The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, *including, but not limited to:* ordering any person to divest himself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce; or ordering dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons.

18 U.S.C. § 1964(a) (emphasis added). Although the section does not expressly mention orders for contribution, it states that the types of relief authorized are "not limited to" those listed. As a general matter, we note that

> [w]hen Congress entrusts to an equity court the enforcement of prohibitions contained in a regulatory enactment, it must be taken to have acted cognizant of the historic power of equity to provide complete relief in light of the statutory purposes. As ... long ago recognized,

"there is inherent in the Courts of Equity a jurisdiction to ... give effect to the policy of the legislature." *Clark v. Smith*, 38 U.S. (13 Pet.) 195, 203, 10 L.Ed. 123.

*Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 291–92, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960). Thus, unless a statute expressly, "or by a necessary and inescapable inference, restricts the court's jurisdiction in equity," we will infer that "all the inherent equitable powers of the District Court are available for the proper and complete exercise of that jurisdiction." *Porter v. Warner Holding Co.*, 328 U.S. 395, 398, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946). We therefore consider whether a contribution order is an "appropriate order[ ]," 18 U.S.C. § 1964(a), *i.e.*, one that is within the equity power of the court and that is not, expressly or by inescapable inference, inconsistent with other aspects of § 1964(a) or with the overall framework of RICO.

As the Supreme Court has discussed in cases dealing with other remedial provisions of RICO, RICO was designed to be an "aggressive initiative to supplement old remedies and develop new methods for fighting crime." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 498, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). Thus, in interpreting the scope of a RICO provision authorizing the forfeiture of "any interest [the defendant] has acquired ... in violation of section 1962," 18 U.S.C. § 1963(a)(1), the Court noted that "[t]he legislative history clearly demonstrates that the RICO statute was intended to provide new weapons of unprecedented scope for an assault upon organized crime and its economic roots," *Russello v. United States*, 464 U.S. 16, 26, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983).

Similarly, in determining the scope of a provision authorizing a private civil action to recover treble damages for injury "by reason of a violation of" any of RICO's substantive provisions, 18 U.S.C. § 1964(c), the Court concluded that § 1964(c) should be "read broadly" in light

of "Congress' self-consciously expansive language and overall approach" in crafting RICO and Congress's "express admonition that RICO is to 'be liberally construed to effectuate its remedial purposes,'" *Sedima,* 473 U.S. at 497–98, 105 S.Ct. 3275 (quoting Pub.L. 91–452, § 904(a), 84 Stat. 947). The *Sedima* Court stated that, "[i]ndeed, if Congress' liberal-construction mandate is to be applied anywhere, it is in § 1964, where RICO's remedial purposes are most evident." 473 U.S. at 491 n. 10, 105 S.Ct. 3275.

This Court too, in considering orders enjoining civil RICO defendants from, *inter alia,* participating in their prior business and associating with their codefendants for any commercial purpose, and/or ordering them to disgorge assets derived from their unlawful conduct, has recognized that the district court has "broad discretion in fashioning relief" under § 1964(a). *United States v. Private Sanitation Industry Association of Nassau/Suffolk, Inc.,* 44 F.3d 1082, 1084 (2d Cir.1995) (denying motion by defendant Ferrante for stay of injunctive and disgorgement orders pending appeal); *see also United States v. Private Sanitation Industry Association of Nassau/Suffolk, Inc.,* 47 F.3d 1158 (2d Cir.1995) (summarily affirming those orders against Ferrante), *cert. denied,* 516 U.S. 806, 116 S.Ct. 50, 133 L.Ed.2d 15 (1995); *United States v. Private Sanitation Industry Association of Nassau/Suffolk, Inc.,* 995 F.2d 375, 377 (2d Cir.1993) (affirming injunctive order against defendant Avellino and noting that RICO "grants courts broad discretion and latitude in enjoining violators from activities that might lead to future violations").

The legislative history of § 1964(a) in particular reveals that Congress intended that subsection to constitute broad authorization for entry of remedial orders. The Report of the Judiciary Committee of the House of Representatives on the Organized Crime Control Act of 1970, of which RICO was part, stated that the provision that would eventually become § 1964(a)

> contains broad provisions to allow for reform of corrupted organizations. *Although certain remedies are set out, the list is not meant to be exhaustive, and the only limit on remedies is that they accomplish the aim set out of removing the corrupting influence and make due provision for the rights of innocent persons.*

H.R.Rep. No. 91–1549, *reprinted in* 1970 U.S.C.C.A.N. 4007, 4034 (emphasis added). Similarly, the Senate Judiciary Committee Report on that legislation stated that

> [w]here an organization is acquired or run by defined racketeering methods, then the persons involved can be legally separated from the organization, either by the criminal law approach ... or through a civil law approach of *equitable relief broad enough to do all that is necessary to free the channels of commerce from all illicit activity.*

S.Rep. No. 91–617, at 79 (1969) (emphasis added).

In *United States v. Carson,* we considered the scope of § 1964(a) in connection with a district court order requiring a civil RICO defendant, a retired labor union official, to disgorge sums he had embezzled or received as kickbacks during his stewardship of the union. Noting that § 1964 provides the only source of authority for the granting of relief in a civil RICO action brought by the government, and that § 1964(a) speaks in terms of "prevent[ing]" and "restrain[ing]" RICO violations, we concluded that § 1964(a) is a forward-looking section: "the jurisdictional powers in § 1964(a) serve the goal of foreclosing future violations, and do not afford broader redress," *Carson,* 52 F.3d at 1182. We thus framed the question as "whether the disgorgements ordered here are designed to 'prevent and restrain' *future* conduct rather than to punish *past* conduct." *Id.* (quoting 18 U.S.C. § 1964(a)) (emphases in original). While recognizing the legislative history as to § 1964(a)'s intended

breadth, see *Carson*, 52 F.3d at 1181, we rejected the proposition that "[c]ategorical disgorgement of all ill-gotten gains [can] be justified simply on the ground that whatever hurts a civil RICO violator necessarily serves to prevent and restrain future RICO violations," *id.* at 1182 (internal quotation marks omitted). "Ordinarily, the disgorgement of gains ill-gotten long in the past will not serve the goal of prevent[ing] and restrain[ing] future violations unless there is a finding that the gains are being used to fund or promote the illegal conduct, or constitute capital available for that purpose." *Id.* (internal quotation marks omitted). We therefore remanded to the district court "for a determination as to which disgorgement amounts, if any, were intended solely to prevent and restrain future RICO violations." *Id.* (internal quotation marks omitted).

Sasso's reliance on *Carson* for the proposition that a former union officer cannot be compelled to contribute to the cost of ridding the enterprise he corrupted of the vestiges of his racketeering activities is entirely misplaced. In *Carson*, we dealt with a disgorgement order, not with an order of contribution to the funding of a monitorship; and we reversed only to the extent that the sums ordered disgorged were not meant for the prevention of future RICO violations. Our remand plainly allowed an order requiring the payment of any amounts that were "intended solely to prevent and restrain future RICO violations." 52 F.3d at 1182 (internal quotation marks omitted).

In the present case, we deal with an order for Sasso's payment of money into a fund that plainly is to be used to prevent further violations of section 1962. The mission of the Local 282 monitorship is to oversee the operations of the Local until it is cleansed of all racketeering and organized crime influence, and honest elections may be held. That mission is unquestionably forward-looking, and it cannot be accomplished unless the monitorship is adequately funded. As the district court stated,

> there is no question that additional funding for the Local 282 monitorship will help prevent the illegal conduct Sasso fostered at Local 282. Indeed, the monitorship in this case was created for the express purpose of eradicating the possibility of future labor racketeering by Local 282 officials.

13 F.Supp.2d at 403.

Sasso's contention that ordering contribution from him is inappropriate because he has now been enjoined from engaging in the pertinent activities, thereby preventing him from committing any future RICO offense, is doubly flawed. First, there was evidence from the Corruption Officer that Sasso, while imprisoned following his RICO conviction, had hundreds of communications with persons associated with organized crime, persons associated with Local 282, persons whose businesses were within the Local's jurisdiction, and persons who had previously made illegal payments to corrupt Local officials. That evidence easily demonstrates that there can be no effective monitorship without attention to Sasso's own current activities. Sasso's suggestion that such attention is unnecessary because he has been enjoined rings hollow in light of his postconviction conduct and in light of the pattern of concealment previously engaged in by the individual defendants, which included clandestine meetings, surreptitious money transfers, and lying under oath. Second, even if Sasso himself had not continued to have suspicious contacts with the persons described above, it would be well within the court's equity powers to conclude that Sasso, having engaged in conduct that corrupted the union, should bear part of the cost of eliminating that corruption.

It may be that requiring contribution by Sasso will prove no more effective to prevent future RICO violations than would leaving the remaining costs to be borne entirely by Local 282. However, in crafting civil remedies for RICO violations, the

court is required to "mak[e] due provision for the rights of innocent persons." 18 U.S.C. § 1964(a). Forcing the Local to bear the entire remaining cost of the monitorship would plainly have an impact on the amount and/or utilization of the dues paid by individual union members. It is well within the proper exercise of the court's discretion to conclude that the equities lie not with Sasso but with innocent members of the Local who did not participate in the criminal activities of Sasso and his coconspirators.

In sum, in light of § 1964(a)'s expansive language, its legislative history, and the traditional power of the district courts to fashion equitable remedies, we conclude that the district court's order that Sasso contribute to the funding of the Local 282 monitorship was within the authority conferred by § 1964(a). Neither *Carson* nor any other precedent suggests a contrary conclusion.

■ Finally, we reject Sasso's additional contention that the district court's order was unauthorized because the government lacked standing to seek his contribution to the funding of the monitorship. That contention, which is premised on the government's failure to "allege that Mr. Sasso's activities were the proximate cause of any injuries to the United States which could be redressed by requiring him to contribute to the Local 282 monitorship" (Sasso brief on appeal at 25), is fundamentally flawed. Section 1964(b) authorizes the government to bring suit under § 1964. Although § 1964(c), which permits a civil RICO suit for treble damages by "[a]ny person injured in his business or property" due to a criminal RICO violation, plainly requires a showing of injury, the government requested relief in this suit not under subsection (c) but only under subsection (a). Section 1964(a) contains no requirement that the government show that it was injured.

## C. *The Level of Contribution*

■ In fixing the amount of contribution to be paid by Sasso, the district court stated that, with respect to the first four years of the monitorship, "[g]iven all of the former and present facts, the Court feels defendant should bear approximately fifteen (15%) percent of the costs ... or $136,000." 13 F.Supp.2d at 403. Although factual recitations earlier in the court's opinion suffice to show why the court concluded that Sasso should bear some portion of the cost of the monitorship, the court did not discuss the role of Sasso in comparison to that of other individuals who were responsible for corruption in Local 282.

■ While "punctilious detail" is unnecessary, *In re Mazzeo*, 167 F.3d 139, 142 (2d Cir.1999) (internal quotation marks omitted), a district court must set forth its factual findings sufficiently to permit meaningful appellate review. *See, e.g., Kelley v. Everglades Drainage District*, 319 U.S. 415, 422, 63 S.Ct. 1141, 87 L.Ed. 1485 (1943); *Mayo v. Lakeland Highlands Canning Co.*, 309 U.S. 310, 316–17, 60 S.Ct. 517, 84 L.Ed. 774 (1940); *Itel Containers International Corp. v. Atlanttrafik Express Service Ltd.*, 909 F.2d 698, 704 (2d Cir.1990). Since the court made no findings that reveal how it arrived at 15 percent as Sasso's appropriate share of the expense, we vacate the amended judgment and remand for findings with respect to that question.

## CONCLUSION

We have considered all of Sasso's contentions on this appeal and, except as indicated above, have found them to be without merit. We affirm the district court's ruling that Sasso must contribute to the funding of the Local 282 monitorship. The amended judgment is vacated, and the matter is remanded for findings with respect to the appropriate level of that contribution. Our remand does not foreclose the possibility that the district court may

permissibly find that a level of contribution at, above, or below 15 percent is appropriate.