**UNITED STATES of America,
Plaintiff,**

v.

**Robert SASSO, Defendant.**

**No. CV 94-2919 (MLO).**

United States District Court,
E.D. New York.

Oct. 19, 2001.

Charles G. Slepian, New York City, for Robert Sasso.

Stephen J. Riegel, Michael J. Goldberger, United States Attorney's Office, Brooklyn, NY, for U.S.

## MEMORANDUM AND ORDER

ORENSTEIN, United States Magistrate Judge.

In accordance with the mandate of the United States Court of Appeals for the Second Circuit, dated, June 13, 2000, which remanded this action back to the District Court for certain findings and the further order of District Judge Platt which referred this matter to the undersigned to report and recommend with regard to the mandate of the United States Court of Appeals for the Second Circuit, this Court has acted. *See United States v. Sasso,* 215 F.3d 283 (2d Cir.2000); *Order,* dated January 25, 2001, (Platt, D.J.).

At the initial stage of the proceeding the parties consented that the undersigned preside over this matter pursuant to 28 U.S.C. § 636(c). *See Transcript of Hearing,* dated January 25, 2001,[1] at 3-4. Thereafter, District Judge Platt "so ordered" the consent of counsel that the action be assigned to the undersigned for all purposes. *Order,* dated April 16, 2001, (Platt, D.J.) (Docket Item # 272). On April 16 and 17, 2001, this Court conducted a bench trial. This memorandum and order constitutes

---

1. Further references to the transcript will be cited as "(Tr. at ___).".

the Courts Findings of Fact and Conclusions of Law pursuant to Fed. R. Civ. P. 52(a).

## BACKGROUND

The Court assumes familiarity with the background of this underlying civil RICO action.[2] *See Sasso,* 215 F.3d at 283; *United States v. Local 282 Int'l Bhd. of Teamsters,* 13 F. Supp.2d 401 (E.D.N.Y.1998).

The Second Circuit affirmed the District Court's ruling that Sasso must contribute to the funding of the Local 282 monitorship. *Sasso,* 215 F.3d at 292; 18 U.S.C. § 1964(a). The Second Circuit stated:

> In the present case, we deal with an order for Sasso's payment of money into a fund that plainly is to be used to prevent further violations of section 1962. The mission of the Local 282 monitorship is to oversee the operations of the Local until it is cleansed of all racketeering and organized crime influence, and honest elections may be held. That mission is unquestionably forward-looking, and it cannot be accomplished unless the monitorship is adequately funded.

*Sasso,* 215 F.3d at 291.

In remanding the action with respect to the issue of the level of contribution of Sasso, the Court said in pertinent part:

> Although factual recitations earlier in the court's opinion suffice to show why the court concluded that Sasso should bear some portion of the cost of the

monitorship, the court did not discuss the role of Sasso in comparison to that of other individuals who were responsible for corruption in Local 282.

*Id.* at 292.

The District Court (Platt, J.) approved the consent judgment entered into between the plaintiff, the defendant, Local 282 of the International Brotherhood of Teamsters, and the non-party International Brotherhood of Teamsters ("IBT") on March 22, 1995. (Pl.'s Exh. 1, dated March 22, 1995). Exhibit 1 provided that the non-party IBT appoint a trustee of Local 282 subject to disapproval by the Court. The trustee was required to act in accordance with the provisions of the IBT constitution and the consent judgment. (Pl.'s Exh. 1, Art. II).

The consent judgment also provided for the appointment of a corruption officer and such officer's powers and duties. (Pl.'s Exh. 1, Art. III *et seq.*).[3] In July 1995, the corruption officer, Robert Machado, assumed office and administered the monitorship. The monitorship was funded in part by the proceeds of the settlements with co-defendants Carbone and Matarazzo, which were placed into an escrow account. (*Stipulation of Settlement and Order,* dated November 8, 1994). Carbone paid the sum of $92,500 in full settlement of his obligation and waived his claim for vacation pay. (*Id.*). Matarazzo paid the sum of $90,000 to the monitorship fund known as the escrow account. *See Stipu-*

---

**2.** The civil RICO action commenced in June 1994 against Robert Sasso, Michael Carbone, Michael Bourgal, John Probeyahn, Joseph Matarazzo (the "defendants"), Local 282 of the International Brotherhood of Teamsters ("Local 282" or the "union"), and the Executive Board of Local 282 pursuant to 18 U.S.C. § 1964. The complaint alleged that each defendant (1) had conducted the affairs of Local 282 through a pattern of racketeering activity in violation of 18 U.S.C. § 1962, and (2) had conspired to do so, in violation of 18 U.S.C.

§ 1962(d). The complaint sought equitable relief designed to "eliminate and enjoin organized crime's control, infiltration and corruption in Local 282, to prevent Local 282's and organized crime's extortion of construction businesses and to have the individual defendants divest and disgorge any interests and proceeds they have received from the enterprise described herein." (Compl. ¶ 2).

**3.** On November 3, 1998, an amended judgment was filed. (Pl.'s Exh. 2).

*lation of Settlement and Order,* dated February 24, 1995 (Docket Item # 15). Sometime later co-defendants Bourgal and Probeyahn each "contributed $50,000 to the fund." (Tr. at 38).

In July 1998, the government submitted to the district court (Platt, J.) a declaration by the IBT Trustee stating that since its creation, the monitorship had expended approximately $681,000 and that expenditures totaling $225,000 more were expected before the scheduled end of the monitorship in May 1999, the time originally projected for the end of the monitorship's appointment. *See Local 282 International Brotherhood of Teamsters,* 13 F. Supp.2d at 402. Thus, for the original duration of the monitorship, the costs and expenditures totaled $906,000. The declaration also stated that an anticipated proposal for a four-year extension of the monitorship envisioned an additional cost of $800,000. *See Sasso,* 215 F.3d at 287.

At the hearing before this Court in April 2001, the government submitted the following "Breakdown of Expenses of Local 282 Monitorship":

| | | | |
|---|---|---|---|
| 7/95-2/01 | Corruption Officer Salary | $ | 649,589.84 |
| 7/95-2/01 | Cell Phone | $ | 15,496.96 |
| 7/95-2/01 | Beeper | $ | 895.66 |
| | Postage and Supplies | $ | 7,000.00 |
| | Secretarial Help | $ | 57,205.84 |
| 8/95-12/00 | Monies used in Escrow Account | $ | 478,522.22 |
| 8/00-11/00 | Election Expenses due to Trusteeship | $ | 6,698.20 |
| 7/94-3/01 | Attorneys fees in connection with with Consent Decree | $ | 123,692.50 |
| | TOTAL: | | $1,335,904.22 |

(Tr. at 29; Exh. 5).

Sasso has failed to show any evidence that he did not directly or indirectly induce or participate in the racketeering activities alleged in the civil complaint.[4] Sasso contends principally that he should not be required to pay for the costs of the monitorship because his unlawful activities ceased some time ago. However, one of the purposes of the monitorship is to reform the corrupt organization he nurtured and built, to remove the corrupting influence, and provide for the rights of the previously intimidated rank and file honest employees by preventing the illegal conduct Sasso and others fostered at Local 282.

The defendants herein are responsible for the fact that a monitorship had to be established to cleanse and eradicate corruption from the Local 282. The proceeding herein is not to determine the performance of the monitor and the need for its continuation. *Sasso,* 215 F.3d at 283 (rejecting all of Sasso's challenges to liability and affirming the district court's ruling that Sasso must contribute to the funding of the Local 282 monitorship). Once the monitorship was required, it must be financed. The payments must come therefore from those whose proven conduct was a substantial factor in bringing it about. Those persons were Sasso, his co-defendants and others.

**DISCUSSION**

**1. Comparison of Sasso's Role with Named Defendants**

In order to determine the share of the cost of the funding of the Local 282 monitorship to be paid by Sasso, the Court considers Sasso's responsibility for the corruption in the union in comparison with

---

4. To the contrary, in light of the admissions contained in his plea of guilty to the criminal RICO charge, *see United States v. Sasso,* 92 CR 1344 (TCP), Sasso "admitted that he used his position as a union officer to unlawfully demand and collect cash payoffs and payments from representatives of companies falling under the jurisdiction of Local 282" and that he worked with the Gambino Crime Family "to reap financial gain." *Local 282 of the Int'l Bhd. of Teamsters,* 13 F. Supp.2d at 401; *see United States v. Smith,* 407 F.2d 33, 35 (2d Cir.1969) ("a plea of guilty admits all facts well pleaded"). Union officials, including Sasso and other defendants, shared these unlawfully collected payments with members and associates of the Gambino Crime Family. *Id.*

the named co-defendants in this action by examining numerous factors. First, the Court considers the role of each defendant in Local 282 during the time that each served as an officer.

Sasso was an officer of Local 282 from 1968 to 1992, holding positions as business agent, vice-president, secretary-treasurer and president. He was an associate of the Gambino Organized Crime Family of La Cosa Nostra ("the Gambino Crime Family"). Prior to his indictment in 1992 (which eventually led to the creation of the monitorship in 1995), Sasso, as president of Local 282 from 1984 to 1992, was the highest ranking official and most powerful person engaged in the racketeering activities of the union. (Tr. at 112-113). In describing Sasso's role in the corruption of Local 282, Bruce Mouw[5] stated:

> He was a prime mover, as far as construction ... of 282. He worked closely with the Gambino Family, they had a close working relationship with regard to the construction schemes.

> Because of their backing of the Gambino Family, Sasso was known as a very powerful labor leader in New York. He was not only head of the most powerful labor union, Local 282, but he was backed by one of the strongest families. He had a tremendous amount of clout within the unions and construction industry.

> He received orders what to do from the Gambino Family, virtually every appointment was dictated by them. Again, he was a willing conspirator and participant in the schemes, and he profited greatly from it.

(Tr. at 113).

The second most significant officer in the union was Secretary-Treasurer Michael Carbone. In describing Carbone's role in the union, Mouw testified :

> Michael Carbone, a long-time business agent who later became the secretary/treasurer, the number two person at the Local. For many years he was close to John Cody. He was also in the crew of the Gambino capo named Thomas Bilotti. When Bilotti was killed, he was told to report directly to Salvatore Gravano, and for the next number of years he was a member of Gravano's crew.

> Carbone was also business agent for Manhattan and Staten Island. In addition, he also handled a company - a couple of companies which were organized crime, including AJ Ross, in New Jersey. He also handled Whitestone and a couple of other employers that worked in his jurisdiction.

(Tr. at 114-115).

In comparing Carbone's role in the corruption of the union with Sasso's, Mouw stated:

> All the money floated to the top. So if anybody at 282 got a payoff, they had to send a substantial portion up to Sasso.

> Carbone was only involved in payoffs in his jurisdiction, which is Queens and Staten Island. Everything he got he had to declare to Gravano. Gravano would say okay, give half to Sasso or a third. He could tell him to split.

> So, Carbone was an important figure, but he certainly wasn't as influential and powerful as Bobby Sasso.

(Tr. at 115).

During the time that Sasso was president, Michael Bourgal, John Probeyahn and Joseph Matarazzo were business

---

**5.** Bruce Mouw, a former Special Supervisory Special Agent for the Federal Bureau of Investigation ("FBI"), testified about the FBI's investigation of Local 282 and the Gambino Crime Family's infiltration of Local 282 at the hearing. Mouw's testimony was largely undisputed.

agents for Local 282. (Tr. at 116-117). According to Mouw, "Bourgal was a long-time business agent," and "headed Long Island for Local 282." In assessing Bourgal's role in the union corruption during this period, Mouw stated, "He was involved in some smaller kickbacks or shakedowns. Nothing on a large scale." (Tr. at 116).

In evaluating Probeyahn's role in the corruption of the union, Mouw testified that Probeyahn was a "long-time Brooklyn agent who later became secretary-treasurer of Local 282. He was involved in some of the individual shakedowns in his own area in Brooklyn. But certainly on a small scale compared to Sasso." (Tr. at 117). When Sasso resigned as president in 1992, Bourgal became president and Probeyahn became secretary-treasurer; however, by then, corruption within Local 282 had somewhat diminished. (Tr. at 116). According to Mouw:

> When he [Bourgal] became president, it was in 1992, and at that time many of the corrupt schemes I talked about previously, the yardage scheme involving concrete had finished because of several factors. Number one, Gravano was indicted in 1990 along with John Gotti. Around this time there was a lot of, quote, heat from law enforcement and the IRB. Many of the 282 officials were summoned for depositions, including Sasso and Carbone, and also later on they were removed by the IRB. So when Bourgal and Probeyahn took over in 1992, a lot of these blatant kickback schemes or concrete schemes had gone by the wayside because of law enforcement pressure.

(Tr. at 116).

Finally, the least significant official in this action, Matarazzo, was a former business agent who handled the Queens area and retired from the union in early 1989. (Tr. at 115). In assessing Matarazzo's role

in the corruption of the union, Mouw testified that he was "a minor figure compared to Sasso and Carbone." (Tr. at 115).

In summary, the record is clear that Sasso played a substantially greater role in the activities of the union than Bourgal, Probeyahn and Matarazzo, and a marginally larger role than Carbone.

Commensurate with the roles each of these five individuals played in the union, the second factor the Court considers is the degree of the breach of fiduciary duty each of these officials committed. As president of Local 282, Sasso breached his position of public trust by taking part in, as well as allowing the corrupt scheme to flourish. Additionally, as caretaker of the union and trustee of Local 282's funds, Sasso breached his fiduciary duty to the rank and file by enabling companies to circumvent contracts, and thereby diminish union funds. Carbone, additionally abused his position of public trust, as he was an official of the union as well as a trustee of Local 282's funds, who enabled companies to circumvent contracts, thereby diminishing union funds. Bourgal, Probeyahn and Matarazzo, as officers of the union, abused a position of public trust. However, the record indicates that within the scope of this enterprise, each of the latter three individuals played a minor role.

Sasso, as president, had the greatest fiduciary duty to protect the interests and rights of its union members. He not only failed to protect the union members and their funds, but also participated in and facilitated the corrupt practices of Local 282. Accordingly, he was the individual who committed the most egregious breach of fiduciary duty.

The third factor the Court considers, which overlaps with the first two factors, is the connection each defendant had with the corrupt practices that occurred in Local 282. With respect to the three business

agents for Local 282, Mouw testified that: (1) Bourgal "was involved in some of the smaller kickbacks or shakedowns. Nothing on a large scale;" (2) Probeyahn "was involved in some of the individual shakedowns in his own area in Brooklyn. But certainly on a small scale compared to Sasso;" and (3) Matarazzo was "[a] minor figure compared to Sasso and Carbone." (Tr. at 117). As to Carbone, Mouw stated that Carbone was "only involved in payoffs in his jurisdiction, which is Queens and Staten Island ... So Carbone was an important figure, but he certainly wasn't as influential and powerful as Bobby Sasso." (Tr. at 115).

In contrast (and as previously discussed), Mouw testified that Sasso was "the prime mover, as far as ... corruption of 282," "was backed by one of the strongest families," "received orders what to do from the Gambino Family," and "if anybody at 282 got a payoff, they had to send a substantial portion up to Sasso." (Tr. at 113, 115). Moreover, Mouw testified that Sasso was the point person for matters and decisions regarding the pour tax, sweetheart contracts, the concrete fee and appointment of organized crime figures as business agents and on-site stewards, all of which significantly facilitated corruption in the union. (Tr. at 103-114). Finally, Robert Machado, corruption officer for the monitorship, testified that

> Mr. Sasso became president of the union in 1984. And during his period of time from 1984 to 1992 he had contact or direct contact with members of organized crime. He permitted members of organized crime to become members of Local 282, and appointed them to positions as on-site stewards. He took part in schemes to defraud the Local 282 Funds and deprive members of their rightful benefits and took part in activities to accept money or get money from employers or contractors.

(Tr. at 38-39).

In sum, as organized crime's point person, in charge of the union, Sasso played a dominant role in the decisions of the union to engage in illegal activities and enable organized crime's control.

The fourth factor the Court considers is the share of the proceeds illegally collected through union activities with organized crime that each defendant received from their participation in the enterprise.

Mouw testified that during the course of his investigation, he assessed that the Gambino Crime Family generated approximately $2 million annually from its unlawful activities.[6] (Tr. at 105-116; Def. Post-

---

6. Mouw gave examples of such illegal activities as Sasso receiving (and getting a portion of) unlawful cash payments from representatives of companies who wanted to operate without experiencing labor unrest. (Tr. at 109-113). For example, Mouw testified:

> ... So the bottom line was the owner of the company paid $100,000 and that was split between the Bonanno and Gambino families. Each family got 45,000. You would - they would give 10.000 to Robert Sasso to call off the strike. In return for that, the owner of the company - the strike was discontinued. The organizing efforts were terminated. And Bonannos and Gambinos and Sasso got money.
> There was also a little insurance clause for the owner in case the strike was too far

along for Sasso to call it off, the owners were guaranteed a sweetheart contract, and he was also guaranteed, in case someone else tried to organize his workers. Sasso and 282 intervened to say, look, we were here first. That's one example.

> ... There was also one involving a plumbing company that was attempted to be organized by 282. The owner of the plumbing company reached out for a Gambino soldier by the name of Louis DiBono. DiBono went to Gravano, and Gravano told them the company was being organized. And it turned out that the owner paid $80,000 to stop the organization effort. Of that 80,000, Gravano got 20, DiBono got 20,000 and Sasso got 20.

(Tr. at 110-111).

Trial Mem. at 12). Mouw stated:

> This is a fairly good estimate where every year - I am sorry, every month Sammy Gravano would give $100,000 to John Gotti. And this represented the Gambino Family's interest in the labor racketeering with regard to construction. The bulk of this money was generated by Local 282, but a small portion was generated by the other corrupt construction unions, primarily 1018 laborers, Local 23 of the laborers.
>
> So, in the course of the year John Gotti would make 1.2 million every year. Gravano kept 20 percent, i.e., 300 thousand a year. And I estimate the - that Sasso and 282 would keep a quarter, roughly 500,000, and a million and a half go to the administration of the family. Of the 500,000, it is hard to say exactly how much Sasso got, but probably close to 250, in that ballpark. And that's a rough estimate of it.

(Tr. at 113-114).

In short, Sasso received approximately $250,000 annually of the $2 million generated and the remaining $250,000 went to Carbone, the other settling defendants and other corrupt union officials. Thus, of the five named defendants in this action, Sasso most benefitted from the corrupt activities, receiving the largest share of the proceeds.

The final factor the Court considers is the charges to which each defendant pled guilty in the criminal action relating to this case. *See United States v. Sasso*, 92 CR 1344 (TCP). Each defendant plead guilty to one count of conspiring to conduct the affairs of Local 282 through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962 (d) and to two predicate racketeering acts. (Tr. at 118, 151; Exh. 11). In particular, Sasso pleaded guilty on March 18, 1994 to Count 1, Racketeering

Acts 19 and 23 of an eighteen count superseding indictment. Sasso was sentenced principally to 41 months' imprisonment, followed by three years supervised release.[7] (Judgment, dated September 9, 1994).

Each of the remaining defendants pleaded guilty to two different racketeering acts and were sentenced as follows. Carbone was sentenced principally to 37 months' imprisonment, followed by three years supervised release. (Judgment, dated October 7, 1994). Matarazzo was sentenced principally to one year and one day, followed by two years supervised release. (Judgment, dated February 24, 1995). Bourgal and Probeyahn were each sentenced principally to 5 years' probation with a special condition to serve 6 months' house arrest. (Bourgal Judgment, dated July 28, 1995; Probeyahn Judgment, dated July 14, 1995).

On balance, while no one factor is dispositive of the magnitude of Sasso's role in comparison to that of the other named defendants, the record is clear that of these individuals, Sasso was substantially more responsible for the corrupt activities in Local 282 and profited most from organized crime's control therein. This, however, does not end the inquiry. The amount to be contributed to the monitorship fund is offset in part by another consideration.

## II Comparison Of Sasso's Role With Other Conspirators

In fixing the amount of contribution to be paid by Sasso to the funding of the Local 282 monitorship, the Court compares not only the level of participation of the individual co-defendants, but also considers other RICO conspirators (1) such as Sasso's predecessors and successors, as

---

7. Sasso's sentence was imposed on September 9, 1994 and his supervised release commenced on October 29, 1997.

well as (2) others who might not themselves have violated one of the substantive provisions of § 1962,[8] but who, nonetheless, may have knowingly facilitated the criminal scheme and therefore were responsible to some degree for the corruption in Local 282. *See Beck v. Prupis,* 529 U.S. 494, 506-07, 120 S.Ct. 1608, 1617, 146 L.Ed.2d 561 (2000) (noting "a plaintiff could, through a § 1964(c) suit for violation of 1962(d), sue co-conspirators who might not themselves have violated one of the substantive provisions of § 1962."); *Salinas v. United States,* 522 U.S. 52, 64, 118 S.Ct. 469, 477, 139 L.Ed.2d 352 (1997) ("A person . . . may be liable for conspiracy even though he was incapable of committing the substantive offense."); *see United States v. Zichettello,* 208 F.3d 72, 99 (2d Cir.2000) (holding defendants could be convicted of a RICO conspiracy even though they were not involved in operation or management of RICO enterprise and thus were not among the class of persons who could commit the crime directly); *see also Smith v. Berg,* 247 F.3d 532, 537–38 (3d Cir. 2001) (holding liable outsider-defendants who knowingly facilitated the criminal enterprise but who neither undertook to "operate or manage" nor to commit any of the core activities).

■ The RICO conspiracy statute, 18 U.S.C. § 1962(d) makes it unlawful "for any person to conspire to violate any of the provisions of subsection [] . . . (c) of this section." To establish a claim for RICO conspiracy, a plaintiff must prove "the existence of an agreement to violate RICO's substantive provisions." *Cofacredit, S.A. v. Windsor Plumbing Supply Co.,* 187 F.3d 229, 244 (2d Cir.1999). As the Supreme Court instructed in *Salinas:*

A [RICO] conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor . . . One can be a conspirator by agreeing to facilitate only some of the acts leading to the substantive offense. It is elementary that a [RICO] conspiracy may exist and be punished whether or not the substantive crime ensues, for the conspiracy is a distinct evil, dangerous to the public, and so punishable in itself.

522 U.S. at 65, 118 S.Ct. at 476–77.

■ While under RICO's substantive provisions a defendant must have participated, directly or indirectly, in the operation or management of the enterprise to be subject to RICO liability, *see Reves v. Ernst & Young,* 507 U.S. 170, 183, 113 S.Ct. 1163, 1172, 122 L.Ed.2d 525 (1993), for purposes of a RICO conspiracy under Section 1962(d) no such requirement exists and the conspiracy charge is proven if the defendant "knew of and agreed to facilitate the enterprise," *Salinas,* 522 U.S. at 66, 118 S. Ct. at 478. *See also Zichettello,* 208 F.3d at 99 (holding the requirement under § 1962(c) that defendant must have taken some part in directing the operation or management of the enterprise's affairs does not exist under § 1962(d)); *Berg,* 247 F.3d at 538 ("a defendant may be held liable for conspiracy to violate section 1962(c) if he knowingly agrees to facilitate a scheme which includes the operation or management of a RICO enterprise"); *Brouwer v. Raffensperger, Hughes & Co.,* 199 F.3d 961, 966 (7th Cir.2000) ("To con-

---

**8.** The individual named defendants in this case were charged with the substantive RICO violation of 18 U.S.C. §§ 1962 (c), which provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

spire to commit a subsection (c) offense, one would not need, necessarily, to meet the *Reves* requirements: one does not need to agree personally to be an operator or manager.").

Assuming a RICO enterprise exists, as is the case in the instant action, this burden is satisfied if the government demonstrates that the conspirators "know the general nature of the conspiracy and that the conspiracy extends beyond [their] individual role[s]." *Zichettello,* 208 F.3d at 99 (internal quotation marks and citation omitted). The dispositive inquiry under § 1962(d) is "whether an alleged conspirator knew what the other conspirators were up to or whether the situation would logically lead an alleged conspirator to suspect he was part of a larger enterprise." *Id.* (internal quotation marks and citation omitted).

In the case at hand there is ample evidence in the record that other RICO conspirators, who were not named in the complaint in this action, knew about and agreed to facilitate the corruption in Local 282. For example, there were predecessors of Sasso who were at least if not more responsible for corruption in the union, including but not limited to such individuals as Paul Castellano, John Cody, Neil Del La Croce, Joseph Gallo, Thomas Bilotti, Salvatore Gravano, Robert DiBernardo, Alphonse Mosca, Frank DiCicco. (Tr. at 99-103). In addition, there were individuals who became members of Local 282 after Sasso became president and who were also associates or members of organized crime. (Tr. at 72-85) (listing as members of organized crime and union members Joseph Cammarano, Jr. and Sr., Joseph Watts, Frank Fappiano, Michael DiLeonardo, Robert DiBernardo, Peter Menechino, Dino Cammarano and stating there were many others).

Owners of corporations who had collective bargaining agreements with Local 282 likewise played a role in corrupting the union while Sasso was president. (Tr. at 75-76). In identifying such owners, Machado testified:

> Owners of corporations or companies that I had concern with were - contact with were those companies who had collective bargaining agreements with Local 282.
>
> Some owners still try or attempt to pay off the on-site stewards. Some owners still continue to defraud the Local 282 Funds, depriving the members of their benefits.

(Tr. at 76).

While some of these individuals may not have participated directly in the fraudulent activities of the criminal scheme, they nonetheless knowingly facilitated the criminal enterprise. As such, all of these individuals are liable for their part in the RICO conspiracy under 18 U.S.C. § 1962(d).

Furthermore, because "[a] defendant who does not know the entire conspiratorial sweep is nevertheless jointly and severally liable, in the civil context, for all acts in furtherance of the conspiracy," these other conspirators would be liable for damages (absent other legal impediments) caused by the broader conspiracy, and the remedies available against them under § 1964(d) are therefore the same as the relief available against an "operator" and/or "manager" of the criminal scheme under § 1964(c). *Aetna Cas. Sur. Co. v. P & B Autobody,* 43 F.3d 1546, 1562 (1st Cir.1994).

Accordingly, the equitable relief sought against Sasso for his participation in operating and managing the enterprise under § 1962(c) extends to these other conspirators. *See id.; cf. Zichettello,* 208 F.3d at 99-100; *Berg,* 247 F.3d at 538; *Brouwer,* 199 F.3d at 966. Such activities must be factored into the calculus of Sasso's share of the costs of the monitorship.

### III. Portion of Monitorship Expenditures Relating to Sasso's Activities

 In order to determine Sasso's costs for the funding of the monitorship, the Court considers Sasso's responsibility for the past and current expenses of the monitorship, including Sasso's activities during and after his incarceration, and the extent to which Sasso's conduct is attributable to the additional future costs relating to the extension of the monitorship.[9]

First, with respect to expenses of the monitorship relating to activities during his incarceration, the corruption officer stated he had to investigate certain individuals, such as Pasquale Ventimiglia and other members of Local 282, who visited Sasso while he was incarcerated in prison, in violation of those individual's proscriptions under the consent decree to associate with Sasso. (Tr. at 48-49). In addition, the monitorship conducted investigations into telephone calls that Sasso placed to companies involved in the demolition, construction and trucking industries within the jurisdiction of Local 282 and members of the union and with collective bargaining agreements with the union.[10] (Tr. at 59-66). Thus, Sasso is clearly responsible for the expenses and costs incurred for these investigations, even if these investigations failed to uncover evidence of corruption.

Next, the corruption officer reported that since Sasso's release from prison, the proportion of time he spent in activity concerning Sasso was on a daily basis for the first year and a half to two years and while recently there had been some activity, he had not spent much time on surveillance of Sasso. (Tr. at 55). Examples of investigations Machado conducted of Sasso's activities following his incarceration which potentially posed a threat to the union included investigations of: (1) visitors to Sasso's residence, (Tr. at 49-50);[11]

9. As the Second Circuit found, ordering contribution from Sasso is appropriate to prevent and restrain a future RICO offense for two reasons:

> First, there was evidence from the Corruption Officer that Sasso, while imprisoned following his RICO conviction, had hundreds of communications with persons associated with organized crime, persons associated with Local 282, persons whose businesses were within the Local's jurisdiction, and persons who had previously made illegal payments to corrupt Local officials. The evidence easily demonstrates that there can be no effective monitorship without attention to Sasso's own current activities. Sasso's suggestion that such attention is unnecessary because he has been enjoined rings hollow in light of his post-conviction conduct and in light of the pattern of concealment previously engaged in by the individual defendants, which included clandestine meetings, surreptitious money transfers, and lying under oath. Second, even if Sasso himself had not continued to have suspicious contacts with the persons described above, it would be well within the court's equity powers to conclude that

> Sasso, having engaged in conduct that corrupted the union, should bear part of the cost of eliminating that corruption.
> 215 F.3d at 291.

10. The corruption officer acknowledged that the prison approved the high number of telephone numbers Sasso called, including such calls placed to Malcolm James Fellman, (Tr. at 61-62), Ralph Ferrari, (Tr. at 62-63), and Pasquale Ventimiglia, (Tr. at 63-64), Ronald Forino, (Tr. at 64-65), and Worth Construction, Bethel, Connecticut, (Tr. at 64-65). While Machado stated he considered the numerous calls to be a threat to the members of Local 282, he was unable to testify as to the nature of the telephone call or calls Sasso made. (Tr. at 59-65). Notably, as a result of Machado's investigations, Forino, Ventimiglia and Ferrari were dismissed from Local 282 principally because they associated with Sasso while he was in prison. (Tr. at 64).

11. Machado testified:

> From time to time I get information that people have been associating with Mr. Sasso since he was released from prison, which I think there were surveillances conducted.

(2) Sasso's employment with Mack Royce, Demolition, which is in the same industry as Local 282 to see if Sasso would be in contact with Local 282 members, however, to Machado's knowledge, Sasso's employment was approved, (Tr. at 51-52); (3) Sasso's association with Joseph Cammarano, Sr., who was a member of organized crime and former member of Local 282, (Tr. at 53-54); and (4) Sasso's visitation to construction job sites that were under surveillance, (Tr. at 54). Sasso should therefore contribute to the funding of the monitorship, the costs and expenses relating to investigations and surveillance of his activities for the first two years following his release from prison.

Finally, because (1) there is no evidence that Sasso continues to be actively involved in the activities upon which this RICO action is predicated; (2) there is evidence that since the monitorship has been in place, the influences of corruption in Local 282 has diminished, (Tr. at 26-29); (3) the government is unable to ascertain an attributable portion of the costs for these expenditures to Sasso or Sasso's activities, (Tr. at 76-79; Exh. 5); and (4) minimal evidence has been presented to substantiate any costs and expenses incurred because of Sasso and his activities beyond the original duration of the monitorship, the Court, at this time, will limit its consideration of the percentage Sasso should contribute to the funding of the monitorship to the amount of the total costs and expenditures for the original monitorship period, without prejudice to a future application by the government for any future additional costs it can substantiate and/or attribute to Sasso and his activities.

In one particular case with Teddy Furstman I observed Furstman visiting Mr. Sasso's residence for over an hour. There were other occasions I conducted surveillance of Mr. Sasso to determine if other members were associating with him.

## IV. Fixing the Amount of Contribution

Because the establishment of a monitorship and the district court's order that Sasso contribute to the funding of the Local 282 monitorship is an equitable remedy within the authority conferred by § 1964(a), *see Sasso*, 215 F.3d at 292, this Court will use its inherent equitable power to apportion a percentage of responsibility for causing and/or facilitating the occurrence of corruption in the union. *See Porter v. Warner Holding Co.*, 328 U.S. 395, 398, 66 S.Ct. 1086, 1089-90, 90 L.Ed. 1332 (1946); *see also Russello v. United States*, 464 U.S. 16, 26, 104 S.Ct. 296, 302, 78 L.Ed.2d 17 (1983) (noting "[t]he legislative history clearly demonstrates that the RICO § was intended to provide new weapons of unprecedented scope for an assault upon organized crime and its economic roots.").

The government urges this Court to hold Sasso responsible for at least 50% of the costs of the monitorship. Defendant urges this Court to find that he is not obligated to pay any portion of monitorship costs. The Court is not persuaded by either position.

Weighing (1) the degree of responsibility of Sasso for causing and facilitating the corruption in Local 282 as compared to the other named co-defendants, and finding his role in the enterprise to be substantial, *with* (2) the degree of responsibility of Sasso's predecessors, successors and other conspirators in this RICO enterprise, and finding these others to be at least equally responsible for creating and facilitating the unlawful activities, the Court concludes that of the costs and expenses totaling

(Tr. at 49). However, the Court notes that when Machado was asked if Sasso initiated those contacts, he did not know who did nor did he know the nature of the business contacts between them when the contacts took place. (Tr. at 50).

$906,000 (for the original four-year period of the monitorship), the named defendants in this action should bear approximately half of the total cost of the funding of the monitorship. Notably, Carbone, Matarazzo, Bourgal and Probeyahn entered into a stipulation of full settlement for each of their obligations with respect to the funding of the monitorship, and therefore, the Court need not apportion a percentage and/or amount of contribution for them.

That being said, however, and because in fashioning an equitable percentage this Court is not bound by traditional rules of law governing apportionment, the Court weighs into this equation the amounts the settling defendants contributed to the funding of the monitorship. Utilizing the total cost and expenditures of $906,000 incurred during the original period of the monitorship, the Court notes for guidance that the settling defendants contributed the following percentages to the monitorship fund in full settlement of their obligation:

| | |
|---|---|
| Bourgal | 5% |
| Probeyahn | 5% |
| Matarazzo | 9% |
| Carbone | 10% |

Inasmuch as the district court accepted the amounts set forth in the stipulation of settlements between the government and each of the settling defendants as fair and equitable to all parties concerned under the circumstances, *cf. Papilsky v. Berndt,* 466 F.2d 251 (2d Cir.1972); *In re Seeburg-Commonwealth United Litigation,* 1975 WL 350 (S.D.N.Y. Jan.24, 1975) (observing court is "charged with duty to insure a settlement of a derivative (or class) suit is fair to all parties concerned, including parties who are before the court only through the mechanism of the representative suit"), the Court considers these amounts in conjunction with all the foregoing factors in calculating Sasso's equitable share of liability.

Finally, the evidence is clear that of the defendants in this action, Sasso was the primary violator and control person of the nefarious activities of Local 282. As the highest ranking official, Sasso controlled the activities of others in the union hierarchy, facilitated the acts of others who jointly operated the corrupt enterprise and abused his official position of trust by exploiting companies within Local 282's jurisdiction and the rank and file union members.

## CONCLUSION

Based on the foregoing and weighing the role of Sasso in comparison to that of the other individuals who were responsible for corruption in the union, including Cody and members of organized crime, the Court finds that Sasso should bear twenty percent (20%) of the costs for the original monitorship period, or $181,200, at this time, without prejudice to a future application by the government for future expenditures incurred because of activities related to Sasso.

**SO ORDERED.**